JDN

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Douglas D. Yokois, | No. CV-23-00619-PHX-GMS (JZB) |
| Plaintiff, | |
| v. | **ORDER** |
| Ryan Thornell, et al., | |
| Defendants. | |

Plaintiff Douglas D. Yokois, through counsel, brought this civil rights action under 42 U.S.C. § 1983, the Americans with Disabilities Act (ADA), and the Rehabilitation Act (RA). (Doc. 13.) Several matters are pending before the Court. The Court will first address the Magistrate Judge's Report and Recommendation as to Plaintiff's proposed Third Amended Complaint. Also pending are Plaintiff's Emergency Motion for Preliminary Injunction – ADA Accommodations (Doc. 171), Emergency Motion for Preliminary Injunction (Colonoscopy bowel prep accommodation) (Doc. 182), and Motions for Hearings on the requests for injunctive relief (Docs. 179, 194). The Court will grant Plaintiff's Motions for Hearings and schedule an evidentiary hearing on the two Emergency Motions for Preliminary Injunction.

**I.     Background**

In the operative First Amended Complaint, Plaintiff named as Defendants Arizona Department of Corrections, Rehabilitation, and Reentry (ADCRR) Director Ryan Thornell in his official capacity, and Nurse Practitioner (NP) Natalia Weigel, Nurse Daphne

Thomas, and Contract Monitoring Bureau Administrator Vanessa Headstream in their individual capacities. (Doc. 13.)

Plaintiff alleged that Defendants are violating the ADA by failing to provide him with necessary accommodations for his disabilities and acting with deliberate indifference to Plaintiff's serious medical needs. (*Id.*) Plaintiff suffers from injuries to his back and legs incurred in the 1980s. (*Id.* ¶ 40.) He has been diagnosed with degenerative arthritis of the spine, paralysis of the sciatic nerve, gastritis, superficial scars, limited flexion of the thigh, thoracolumbar spine condition, degenerative disk disorder, degenerative joint disorder of the spine, and right lower extremity radiculopathy; and it was recommended he use a wheelchair. (*Id.* ¶ 46.) Plaintiff also suffers from severe obstructive sleep apnea and has used a Continuous Positive Airway Pressure (CPAP) machine since 2015. (*Id.* ¶¶ 56, 58.) And in 2018, Plaintiff underwent cardiac catheterization surgery. (*Id.* ¶ 52.) Plaintiff requested declaratory relief, injunctive relief in the form of access to necessary medical care and equipment, and costs and attorneys' fees. (*Id.* at 64–65.)

Upon screening, the Court determined that Plaintiff sufficiently stated Eighth Amendment claims for deficient medical care against all Defendants (Counts One and Two) and a claim under the ADA/RA against Defendant Thornell (Count Three). (Doc. 24.)

On April 18, 2025, Plaintiff filed his Emergency Motion for Preliminary Injunction – ADA Accommodations, stating that in March 2025, he was transferred out of a Special Needs Unit (SNU) that provided ADA accommodations for his needs. (Doc. 171 at 3.) Plaintiff seeks an order directing that he be transferred back to the SNU or to another unit that has adequate ADA accommodations. (*Id.* at 4.)

On May 19, 2025, Plaintiff filed his Emergency Motion for Preliminary Injunction (Colonoscopy bowel prep accommodation), which seeks an order for accommodations during the colonoscopy bowel prep because Plaintiff's current housing unit does not have a toilet that is close to his bed or easily accessible by wheelchair. (Doc. 182.)

///

- 2 -

**II.     Report and Recommendation**

The Court has reviewed the Report and Recommendation as to the Third Amended Complaint. (Doc. 101, ref. 83.) In reviewing an R&R, the Court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). "[T]he district judge must review the magistrate judge's findings and recommendations de novo if objection is made, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc); *see Thomas v. Arn*, 474 U.S. 140, 149 (1985) (finding that district courts need not conduct "any review at all . . . of any issue that is not the subject of an objection" ).

Plaintiff objects to the recommended dismissal of portions of Counts Two and Four. (Doc. 108 at 3-7.) Plaintiff does not challenge the remaining portions of the R&R and they are adopted. *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).[1]

As for Count Two, Plaintiff maintains his diabetes is not well controlled and because it is a comorbidity with his other serious health conditions, the failure to adequately monitor his diabetes constitutes deliberate indifference. But in his objections, Plaintiff refers to all Defendants collectively and does not point to specific conduct by a specific Defendant that allegedly rises to the level of deliberate indifference. Indeed, a de novo review of the Third Amended Complaint does not reveal sufficient allegations of deliberate indifference

---

[1] The Report and Recommendation determines Plaintiff stated a claim against the Doe FHA Defendants, who are unknown Facility Health Administrators ("FHAs") at ASPC Lewis, ASPC Eyman, and ASPC Tucson. (Doc. 83 at 8-9.) Plaintiff also includes Jeffrey Van Winkle, the former warden of ASPC Florence, and later the associate FHA and FHA at ASPC Florence, among the "FHA Defendants." (*Id.* at 8.). The Court will not require service on the Doe FHA Defendants at this time because it is, in most instances, impossible for the United States Marshal or his designee to serve a summons and complaint upon an anonymous defendant. However, the Court will not dismiss the claim against the Doe FHA Defendants at this time. *Wakefield v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999) (citing *Gillespie v. Civiletti*, 629 F.2d 637, 642 (9th Cir. 1980)) (where identity is unknown prior to the filing of a complaint, the plaintiff should be given an opportunity through discovery to identify the unknown defendants). The Court will allow Plaintiff 60 days in which to discover the actual name of the Doe FHA Defendants and to substitute the FHA Defendants' actual names by filing a "notice of substitution." *See Wakefield*, 177 F.3d at 1163. The Court may dismiss without prejudice the Doe FHA Defendants if Plaintiff fails to timely file a notice of substitution unless Plaintiff seeks and is granted an extension of time.

against Defendants. Rather, it reveals, at most, isolated negligent actions that do not state a claim for a constitutional violation or collectively rise to the level of deliberate indifference. *See* Doc. 83 ¶ 217 (did not perform blood glucose testing on November 10, 2021 but declared Plaintiff's diabetes as well-controlled); ¶ 229 (ADON Thomas "declared" Plaintiff "is not diabetic"); ¶ 267 (Plaintiff asked NP Kary to update his medical record because it incorrectly listed both type 1 and type 2 diabetes as diagnoses); ¶ 280 (NP Avant-Ortiz did not set therapeutic goal for Plaintiff's HbA1c level on August 8, 2022); ¶¶ 298, 303 (NP Thomas did not "identify if [Plaintiff's diabetes] had changed" despite recording on February 1, 2023 and April 14, 2023 it was managed with a fair level of control); and ¶ 307 (Dr. Lesac stated Plaintiff's diabetes was managed with a good level of control despite his HbA1c level rising to 7.3). Plaintiff's objections are overruled as to Count Two.

As for Plaintiff's retaliation claim in Count Four, Plaintiff argues because the Court determined Plaintiff stated an ADA claim for the denial of a wheelchair, it follows the retaliation claim on the same basis should be served. But Plaintiff ignores a crucial element that is required to state a retaliation claim—Defendants taking an adverse action because of Plaintiff's protected conduct. Plaintiff offers no facts to show that Defendants denied Plaintiff a wheelchair because of his prior complaint history. Plaintiff's objections are overruled as to Count Four.

In resolving the pending Report and Recommendation, the Court also resolves Plaintiff's motion for clarification regarding discovery (Docs 115, 118). With the resolution of the Report and Recommendation, NaphCare and Centurion are subject to discovery. Plaintiff's motion for clarification and motion to expedite are therefore granted to the extent this Order addresses them.

## II.    Preliminary Injunction Standard

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520

U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted) ("[a] preliminary injunction is an extraordinary remedy never awarded as of right"). Nonetheless, "federal courts must not shrink from their obligation to enforce the constitutional rights of all persons, including prisoners" and must not "allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation omitted).

A plaintiff seeking a preliminary injunction must show: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in his favor; and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20. When the government opposes a preliminary injunction, "[t]he third and fourth factors of the preliminary-injunction test—balance of equities and public interest—merge into one inquiry." *Porretti*, 11 F.4th at 1047. The "balance of equities" concerns the burdens or hardships to a prisoner complainant compared with the burden on the government defendants if an injunction is ordered. *Id.* The public interest mostly concerns the injunction's impact on nonparties rather than parties. *Id.* (citation omitted). Regardless, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* (citation omitted).

The Ninth Circuit has articulated an alternate formulation of the *Winter* test referred to as the "serious questions" or "sliding scale" approach: a preliminary injunction is appropriate if a plaintiff can show "serious questions going to the merits" and that "the balance of hardships tips sharply in the plaintiff's favor," and the other two *Winter* factors are satisfied. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011) ("the 'serious questions' approach survives *Winter* when applied as part of the four-element *Winter* test"). Under this "serious questions" version of the sliding-scale test, the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another. *See id.* at 1135.

Where a plaintiff seeks a mandatory injunction, rather than a prohibitory injunction, injunctive relief is "subject to a higher standard" and is "permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009)). "This standard does not supersede the Ninth Circuit's 'serious questions' test. Rather, the severity of the legal questions correlates with a movant's likelihood of success; the greater the likelihood of success, the less doubtful the case." *Morrar v. United States*, No. 2:19-cv00833-KJM-KJN, 2019 WL 2715618, at *4 (E.D. Cal. June 28, 2019).

Under the Prison Litigation Reform Act, injunctive relief must be narrowly drawn and be the least intrusive means necessary to correct the harm. 18 U.S.C. § 3626(a)(2); *see Gilmore v. People of the State of Cal.*, 220 F.3d 987, 999 (9th Cir. 2000).

When evaluating the merits of a preliminary injunction motion, a court's factual findings and legal conclusions are not binding at a trial on the merits. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981).

### III.   ADA Accommodations

#### A.   Relevant Facts

On January 30, 2024, while at the Arizona State Prison Complex (ASPC)-Eyman, Cook Unit, Plaintiff underwent a Functional Assessment performed by NP Thomas. (Doc. 61 at 15.) The Functional Assessment listed Plaintiff's diagnoses, including "NIDDM [non-insulin-dependent diabetes mellitus], neuropathy, HTN [hypertension], CHF [congestive heart failure], hypothyroidism, DJD [degenerative joint disease]." (*Id.*) The Functional Assessment concluded that Plaintiff qualified for ADA status and required a cane, medical shoes, a wheelchair and wheelchair accessibility, a walker, a renal diet, a lower tier and lower bunk, and an aide for ambulation. (*Id.*)

On March 8, 2024, Plaintiff was transferred to the ASPC-Tucson Special Needs Catalina Unit, which provided better accommodations for his disabilities. (Doc. 63-2 at 7; *see* Doc. 67.)

On February 20, 2025, a "fall risk score" evaluation was done by Nurse Loomis. (Doc. 177-2 at 2.) Plaintiff's score was 40, which is in the 25-45 "moderate risk" range. (*Id.* at 3.) Nurse Loomis noted Plaintiff's weak and impaired gait: "short steps with shuffle, may have difficulty arising from chair, head down; significantly impaired balance, requiring furniture, support person, or walking aid to walk." (*Id.*) The fall risk report documented that for safety Plaintiff should maintain a bed in low position, with a call bell and urinal within reach, and he is not to be left unattended for transfers or toileting. (*Id.*)

On March 26, 2025, Plaintiff was transferred to ASPC Florence, South Unit. (Doc. 177-1 at 2, Pl. Decl. ¶ 2.) The South Unit is a dorm-like facility with each prisoner's quarters separated by half walls. (Doc. 176 at 3.) Plaintiff avers that his wheelchair does not fit through the door of his dorm; therefore, he must get assistance to stand up and fold his wheelchair to get in or out of the building. (Doc. 177-1 at 2, Pl. Decl. ¶ 4.) Plaintiff further avers that his wheelchair is too big to maneuver in the bathroom, so he must leave it outside and use the bathroom walls for stability while in the bathroom. (*Id.* ¶ 5.) The health unit is approximately a quarter mile from Plaintiff's dorm building, and Plaintiff must go to the health unit twice a day to wait in line for his medications. (Doc. 171 at 6.) There is a long, steep ramp to get to the dirt recreation field that is not accommodating to those with mobility impairments, and there are no wheelchair-accessible toilet facilities on the recreation field. (*Id.*)

Defendants submit a document showing another Functional Assessment performed by NP Alonso. (Doc. 176-2 at 2.) This document includes a box to document the date of the Assessment, which states "4/16/2025." (*Id.*) Written in above this date is a note stating, "initially done 2/13/25." (*Id.*) Another box documents that the Functional Assessment was done at the "Catalina SNU." (*Id.*) Plaintiff was housed in the Special Needs Catalina Unit in February 2025. This Functional Assessment documents that Plaintiff is "ambulatory with assistive device," "wheelchair – unknown diagnosis," and that he is not a fall risk. (Doc. 176-2 at 2.) It also documents that Plaintiff is fully independent with ambulation in a wheelchair and he requires no porter or nursing assistance. (*Id.*) At the bottom of the

- 7 -

form, a note is written stating, "ADA flags added 11/13/23 with no diagnosis or charted explanation. Patient does have numerous health diagnosis independent in all cares, does not require SNU housing." (*Id.*)[2]

Plaintiff avers that he did not undergo a Functional Assessment at the Catalina SNU prior to his March 2025 transfer to the South Unit. (Doc. 177-1 at 2, Pl. Decl. ¶ 3.)

On April 18, 2025, Plaintiff filed his pending Emergency Motion for Preliminary Injunction – ADA Accommodations.

Plaintiff avers that, on April 22, 2025, Deputy Warden of Operations Sanchez came to Plaintiff's dorm with a copy of an email from Defendant Headstream. (Doc. 177-1 at 2, Pl. Decl. ¶ 6.) Plaintiff avers that he showed Sanchez his wheelchair was too big to maneuver through the doorways and that Sanchez confirmed it was true. (*Id.*)

**B.   Legal Standards**

    **1.   Eighth Amendment**

To support a medical care claim under the Eighth Amendment, a prisoner must demonstrate "deliberate indifference to serious medical needs." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). There are two prongs to the deliberate-indifference analysis: an objective standard and a subjective standard. First, a prisoner must show a "serious medical need." *Id.* (citations omitted). A "'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059–60 (9th Cir. 1992), *overruled on other grounds by WMX Techs., Inc. v. Miller*, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc) (internal citation omitted). Examples of indications that a prisoner has a serious medical need include "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an

---

[2] The Court could not find in the record a medical note or Functional Assessment dated November 13, 2023.

individual's daily activities; or the existence of chronic and substantial pain." *Id.* at 1059–60.

Second, a prisoner must show that the defendant's response to that need was deliberately indifferent. *Jett*, 439 F.3d at 1096. "Prison officials are deliberately indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere with medical treatment.'" *Wood v. Housewright*, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988)). Deliberate indifference may also be shown where prison officials fail to respond to a prisoner's pain or possible medical need. *Jett*, 439 F.3d at 1096. "In deciding whether there has been deliberate indifference to an inmate's serious medical needs, [courts] need not defer to the judgment of prison doctors or administrators.'" *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (quoting *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989)).

Even if deliberate indifference is shown, to support an Eighth Amendment claim, the prisoner must demonstrate harm caused by the indifference. *Jett*, 439 F.3d at 1096; *see Hunt*, 865 F.2d at 200 (delay in providing medical treatment does not constitute Eighth Amendment violation unless delay was harmful).

### 2.  ADA

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. In nearly identical language, the RA precludes discrimination on the basis of disability by entities that receive federal funding. 29 U.S.C. § 794.31. The ADA and RA apply to state prisons. *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997) ("we conclude that the plain language of the ADA and RA, and our prior interpretations of that language, support application of the statutes to state prisons").

To prevail on a claim under Title II of the ADA, a plaintiff must demonstrate he is a "(1) qualified individual with a disability; (2) he was either excluded from participation in or denied benefit of a public entity's services, programs or activities; and (3) the

exclusion, denial or discrimination was because of his disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).

A "qualified individual with a disability" is defined as:

> [A]n individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). "Disability" is defined elsewhere in the statutory scheme as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A).

**C.  Discussion**

The evidence shows that Plaintiff requires a wheelchair for mobility, and that, in 2024, he qualified for ADA status and SNU housing. (Doc. 61 at 15.) *See Longberg v. City of Riverside*, No. EDCV970237SGLAJWX, 2007 WL 2005177, at *4 (C.D. Cal. May 16, 2007) (concluding that the plaintiff was a qualified individual with a disability as that term is defined under the ADA because he was permanently disabled and required a wheelchair for mobility).

Defendants maintain that, on February 13, 2025, while Plaintiff was in SNU housing, NP Alonzo performed a Functional Assessment but there was no contemporaneously made record of this Assessment; rather, NP Alonzo filled out the Functional Assessment form two months later on April 16, 2025. (Doc. 176 at 3 n.1.) Defendants do not submit a sworn statement from NP Alonzo. As stated, Plaintiff avers no Functional Assessment was done prior to his March 2025 transfer.

Defendants argue that this yet-to-be documented Functional Assessment supported Plaintiff's March 2025 transfer out of SNU housing because it determined that Plaintiff "could use his wheelchair on a fully independent basis and did not require Special Needs Housing." (*Id.* at 2–3.) This determination was made even though, on February 20, 2025—

1    a week after the undocumented Functional Assessment—a fall risk evaluation found that
2    Plaintiff was at a moderate risk for falls, he required support, he should have a urinal within
3    reach, and he should not be left unattended for toileting.  (Doc. 177-2 at 2.)

4          In response to Plaintiff's averments that his wheelchair does not fit through the dorm
5    or bathroom doorways, Defendants submit the declaration of Defendant Headstream, who
6    avers, "I confirmed Plaintiff's wheelchair is 24 inches in width which fits through the
7    doorway of his dorm unit and the doorway to the bathroom, both of which are ADA
8    compliant."  (Doc. 176-1 at 3, Headstream Decl. ¶ 5.)  Headstream does not explain how
9    she confirmed this information and, thus, her statement does not establish personal
10   knowledge of Plaintiff's wheelchair size and the doorway sizes.  Headstream also avers
11   that she "confirmed" Plaintiff's dorm in the South Unit is ADA compliant; however, she
12   does not explain how she confirmed this or how the Unit is ADA compliant when the
13   recreation field is difficult to access for those with mobility impairments and there are no
14   wheelchair-accessible toilet facilities on the recreation field, and the medical unit that
15   Plaintiff must go to twice a day is a quarter mile away, facts that Defendants do not refute.
16   (*Id.* ¶ 4.)

17         Notably, Plaintiff weighs approximately 336 pounds.  (Doc. 176 at 8.)  Defendants
18   assert that obesity is not a disability.  (*Id.*)  While that may be true,[3] Plaintiff's weight is
19   relevant to his deliberate indifference claim because Defendants are aware that Plaintiff
20   has a serious medical need requiring a wheelchair, aware that Plaintiff was previously
21   housed in SNU housing, and aware of his obesity by the fact that it is obvious; thus, they

---

[3] *See Valtierra v. Medtronic Inc*, 232 F. Supp. 3d 1117, 1124–25 (D. Ariz. 2017) (following other circuits' holdings to find that morbid obesity, standing alone, is not a disability under the ADA; rather, "a person's weight is a physical characteristic that qualifies as a physical impairment only if it (1) falls outside the normal range and (2) occurs as the result of a physiological disorder"); *see also Velez v. Cloghan Concepts, LLC*, 387 F. Supp. 3d 1072, 1076 (S.D. Cal. 2019) (determining that, because the Ninth Circuit has not yet addressed whether obesity without a physiological cause constitutes an impairment under the ADA, the district court would adopt the EEOC's definition that "weight may be an impairment when it falls outside the normal range *or* occurs as the result of a physiological disorder") (emphasis in original).

- 11 -

1 can easily infer the risk of serious injury from a fall if Plaintiff is forced to get out of his
2 wheelchair without assistance to use the bathroom. *See Cummings v. Klee*, 410 F. Supp.
3 3d 837 (E.D. Mich. 2019) (finding question of fact whether provider was deliberately
4 indifferent and whether her "actions were the products of measured medical decisions"
5 when she limited prisoner's use of wheelchair to long distances only despite originally
6 giving him full wheelchair accommodation, knowing that he previously lived in wheelchair
7 accessible housing, and knowing he was 68 years old and weighed between 250 and 275
8 pounds "so she could easily infer that . . . [a] fall[] could be catastrophic").

9 If Plaintiff was transferred out of SNU housing without any examination, Functional
10 Assessment, or documented change in his physical condition and sent to a Unit that cannot
11 accommodate his wheelchair, safely provide outdoor recreation, provide convenient access
12 to the medical unit, or provide the assistance he needs, he may be able to show a likelihood
13 of success on the merits or, at the least, serious questions going to the merits of his claim.
14 *See Republic of the Phil. v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988) ("[s]erious
15 questions need not promise a certainty of success . . . but must involve a fair chance of
16 success on the merits") (internal quotation omitted); *see also Muhammad v. Dep't of
17 Corrs.*, 645 F. Supp. 2d 299, 314 (D. N.J. 2008) (holding that prisoner amputee stated an
18 ADA claim after he was transferred from a handicapped accessible cell to a second-floor
19 cell with limited access to the handicapped-accessible shower, without any penological
20 explanation for the transfer).

21 With respect to the second *Winter* factor, Plaintiff must demonstrate that, absent an
22 injunction, he will be exposed to irreparable harm. *Caribbean Marine Servs. Co., Inc. v.
23 Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988); *see Winter*, 555 U.S. at 22. "[T]here must be
24 a presently existing threat of harm, although injury need not be certain to occur."
25 *Villanueva v. Sisto*, CIV S-06-2706 LKK EFB P, 2008 WL 4467512, at *3 (E.D. Cal. Oct.
26 3, 2008) (citing *FDIC v. Garner*, 125 F.3d 1272, 1279–80 (9th Cir. 1997)). The Eighth
27 Amendment does not require prisoners "seeking a remedy for unsafe conditions [to] await

a tragic event" before obtaining relief. *Farmer v. Brennan*, 511 U.S. 825, 845 (1994) (internal quotation omitted).

To support that he is at risk of imminent harm, Plaintiff relies on the February 2025 fall risk score and the fall risk determination's safety factors stating that Plaintiff should ambulate with assistance and not be left unattended for transfers and toileting. (Doc. 177-2 at 3.) Defendants argue that a risk of falling is insufficient, and that Plaintiff has not asserted he has fallen when passing through the bathroom or dorm doorways. (Doc. 176 at 7– 8.) But in an April 15, 2025 medical record submitted by Defendants, the telemedicine provider documented Plaintiff's report that he is in a wheelchair and needs to be in a handicap dorm because he falls down "all the time," he does not have a wheelchair pusher, he weighs 340 pounds, it is hard to get around, and he has not been to the chow hall for a year. (Doc. 176-4 at 4.)

While the possibility of some remote future injury is insufficient to warrant injunctive relief, *see Winter*, 555 U.S. at 20, evidence that Plaintiff requires a wheelchair, he is obese, and that he was determined to be a fall risk and requires assistance, supports that Plaintiff's likelihood of falling while using the bathroom and getting out of his wheelchair to fold it up and move it through a doorway is not speculative and remote. Rather, a fall risk evaluation specifically warned there is a risk of falling and certain preventive measures should be taken. The record indicates that no such measures are being taken.

Moreover, "[t]he deprivation of constitutional rights unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012); *see Nelson v. Nat'l Aeronautics & Space Admin*, 530 F.3d 865, 882 (9th Cir. 2008), *rev'd on other grounds*, 562 U.S. 134 (2011) ("[u]nlike monetary injuries, constitutional violations cannot be adequately remedied through damages and therefore generally constitute irreparable harm").

Due to the parties' disputes over the date of Plaintiff's Functional Assessment, whether the Functional Assessment was based on sound medical decisions, whether

1 Plaintiff's wheelchair can fit through the bathroom and dorm doorways, whether Plaintiff
2 is at risk of irreparable harm, and the remaining two *Winter* factors, the Court will grant
3 Plaintiff's request for a hearing on his Emergency Motion for Preliminary Injunction –
4 ADA Accommodations.

## IV. Colonoscopy Bowel Prep

### A  Relevant Facts

Since at least 2023, Plaintiff has been diagnosed with chronic anemia and low iron, and according to a July 2023 medical note, the source of blood loss had not yet been found. (Doc. 189-4 at 2.)

Plaintiff was scheduled for a colonoscopy on March 9, 2024. (Doc. 186-2 at 2) On March 8, 2024, Plaintiff submitted an HNR stating:

> I'm 63 and wheelchair-dependent I'm unable to drink a gallon of bowel prep on my dorm run with one (1) accessible-toilet I must share with 21 others without being incontinent of stool. Unless I'm pre-admitted the night before to do the prep as other[s] similarly situated have been, I'll refuse to take the prep. I'm not refusing the gastroscopy/endoscopy/colonoscopy.

(*Id.*) Plaintiff's request was denied, and the scheduled colonoscopy did not occur. (Doc. 189-1 at 2, Pl. Decl. ¶ 6.)

On March 11, 2024, Plaintiff was transferred from the Cook Unit to Catalina SHU. (*Id.* ¶ 7.)

Plaintiff avers that, in May 2024, he was informed of a pending colonoscopy, and he requested "(1) preadmission to the hospital the night before, (2) to be placed in a solitary cell the night before, or (3) a potty chair placed in my bed area the night before to do my bowel prep." (*Id.* ¶ 8.) Plaintiff avers that the colonoscopy was cancelled because medical staff failed to stop Plaintiff's Eliquis (anticoagulant) and Ozempic (GLP-1 agonist) medications two weeks prior to the procedure as required. (*Id.* ¶ 9.)

Plaintiff was scheduled for a colonoscopy on June 25, 2024; however, according to a medical note, the procedure was cancelled due to "transportation cap" and because

Plaintiff took medication that was supposed to be withheld prior to the procedure. (Doc. 189-2 at 2.)

Plaintiff was scheduled for a colonoscopy on August 30, 2024. (Doc. 186-2 at 2.) Dr. Rahman entered a medical note authorizing a "diaper for offsite to GI for colonoscopy - 8/30/2024." (*Id.* at 3.) Dr. Rahman also noted that Plaintiff requested a bedside commode during colonoscopy prep and the nurse would check to see if there was one he could use. (*Id.* at 7.) A subsequent medical note documented that the colonoscopy was "cancelled by alicia.germany on 8/30/2024 Reason: patient refused." (*Id.* at 2.) Another medical note documents that Plaintiff refused to get into the transport van because he had not received proper bowel prep. (*Id.* at 5.)

In December 2024, a colonoscopy was ordered; however, on January 29, 2025, NP Ceballos made a medical entry that Plaintiff's colonoscopy was cancelled, and it was noted Plaintiff was asymptomatic and had no family history of colon cancer. (Doc. 186-1 at 2–3, 8.) The medical note stated that Plaintiff would receive a Cologuard test instead. (Doc. 186-2 at 8.)

On March 4, 2025, Plaintiff's Cologuard results were "Positive." (Doc. 186-2 at 11.) A medical note documented that Plaintiff's upcoming provider appointment was changed to "priority" and a colonoscopy was recommended. (*Id.*)

On April 18, 2025, Plaintiff saw a provider via telemedicine. (Doc. 186-2 at 9.) The provider documented that Plaintiff had a positive Cologuard test and it was discussed with Plaintiff that the next stop is a colonoscopy. (*Id.*)

Plaintiff avers that, in his dorm, there are two available toilet stalls for 23 prisoners. (Doc. 189-1 at 3, Pl. Decl. ¶¶ 10, 12.) The toilets are approximately 50 feet from Plaintiff's bed. (*Id.* ¶ 11.) Plaintiff avers that both toilets are not always in service because one backs up a lot. (*Id.* ¶ 13.) Plaintiff can only get his wheelchair into one of the stalls. (*Id.* ¶ 14.) To use the toilet in his dorm, Plaintiff must transfer from his bunk to his wheelchair, wheel himself to the bathroom, and transfer from the wheelchair to the toilet, with each step taking several minutes. (*Id.* ¶ 16.) Due to the way in which the bathroom is constructed, it is very

1  difficult for Plaintiff to navigate into and out of his wheelchair; therefore, he usually leaves his wheelchair outside of the bathroom and uses the walls and grab bars to get into and out of the bathroom. (*Id.* ¶ 17.) Plaintiff avers that a private commode or potty chair will not fit into his cubicle with his wheelchair in the cubicle. (*Id.* ¶ 18.) He further avers that using a potty chair in his cubicle for bowel prep would "cause an uproar" among other prisoners due to the smell of accumulating feces. (*Id.* ¶ 19.)

Plaintiff further avers that transportation protocols require him to report to the yard office/sally port 20–60 minutes prior to a van pickup, he is subject to a strip search, and his hands and feet are chained to a waist chain. (*Id.* ¶ 15.) Defendants confirm that travel time to Plaintiff's colonoscopy appointment would take approximately 1.5 hours. (Doc. 186 at 7.)

**B.     Discussion**

As set forth above, the objective prong in an Eighth Amendment medical care claim addresses whether Plaintiff has a serious medical need. *See Jett*, 439 F.3d at 1096. The record shows that, over the last year, medical providers have repeatedly recommended that Plaintiff undergo a colonoscopy, and a March 2025 Cologuard test was positive, resulting in a "priority" medical appointment and another recommendation for a colonoscopy. Because numerous providers have determined, based on Plaintiff's condition and medical tests, that he requires a colonoscopy, Plaintiff's condition has been worthy of comment and treatment, which satisfies the objective prong. *See McGuckin*, 974 F.2d at 1059–60.

The subjective prong considers whether Defendants' response to Plaintiff's needs manifests deliberate indifference. *See Estelle*, 429 U.S. at 104. Plaintiff maintains that requiring Plaintiff to use the toilets at his dorm for colonoscopy bowel prep despite his use of a wheelchair and the attendant difficulties or requiring him to use a portable commode next to his bed for bowel prep in a public dorm setting that would expose other prisoners to the sound and odor of bowel prep, and force Plaintiff to defecate in front of other prisoners, constitutes deliberate indifference. (Doc. 189 at 10.)

In their Response, Defendants suggest that Plaintiff is in a different housing Unit than when he filed his Emergency Motion for Preliminary Injunction (Colonoscopy bowel prep accommodation), and that there is no evidence the toilets in his current housing Unit would pose the same alleged problems. (Doc. 186 at 7.) But there is no evidence in the record that Plaintiff was transferred again after his March 2025 transfer to the South Unit, and Plaintiff filed his pending Motion on April 18, 2025. (Doc. 171.) Defendants also argue that offering a commode for bowel prep is a reasonable accommodation and they insist that a commode was not offered to Plaintiff to punish or humiliate him; however, the record indicates only that a provider requested a commode, and a nurse would check into it. (*Id.* at 8, 10.) There is no evidence that a commode was ever provided to Plaintiff for bowel prep and he refused to use it.

Defendants focus the rest of their argument on Plaintiff's request that he be taken to the hospital the night before the colonoscopy so that he can conduct the bowel prep in a hospital room with an accessible toilet. (*Id.* at 7–8.) On the briefing, Plaintiff has failed to show that such relief would constitute the least intrusive means necessary to correct the harm. *See* 18 U.S.C. § 3626(a)(2). But he has raised serious questions as to whether Defendants' failure to consider any other accommodations to allow Plaintiff, who is in a wheelchair and housed in a dorm setting, to conduct the bowel prep in a manner that is hygienic and civilized constitutes deliberate indifference. *See Estelle*, 429 U.S. at 102 ("[t]he [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency") (internal quotation omitted); *Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("[t]he basic concept underlying the Eighth Amendment is nothing less than the dignity of man").

As to the second *Winter* element, the parties dispute whether Plaintiff is subject to an irreparable injury. Defendants assert Plaintiff has repeatedly refused colonoscopies and suggest that this undercuts any claim that the lack or delay of a colonoscopy constitutes irreparable injury. (Doc. 186 at 9.) Plaintiff asserts prior colonoscopies have been

cancelled due to Defendants' conduct—either medical staff's failure to comply with prep protocol or the denial of appropriate accommodations for Plaintiff to complete the prep.

Apart from this dispute, the record shows that providers have repeatedly recommended a colonoscopy for over a year, and he recently received a positive Cologuard test, prompting a priority provider appointment and renewed recommendation for a colonoscopy.

Plaintiff presents an expert report from Dr. Susan E. Lawrence, who is board certified in internal medicine and oncology and a former Staff Physician/Medical Director at the Adelanto Detention Facility, a federal detention facility in California. (Doc. 182-1 at 3, 26.) Dr. Lawrence reviewed Plaintiff's medical records and noted that he is diagnosed with iron deficiency anemia, which is a serious medical condition. (*Id.* at 8, 18, 23.) Dr. Lawrence stated that a colonoscopy is used to evaluate iron deficiency anemia, and she opined that "if [Plaintiff] has an underlying colorectal cancer that is causing his iron deficiency anemia, it no doubt has continued to grow and because of this delay may reach a point at which it is no longer curable." (*Id.* at 8, 24.) Dr. Lawrence further opined as to the importance of proper bowel prep for colonoscopies and noted that prison infirmary level care would provide Plaintiff with his own accessible toilet and nursing staff to assist him if necessary. (*Id.* at 24.) Dr. Lawrence cited to the National Commission on Correctional Health Care, which sets nationally accepted standards of care for patients in prison. (*Id.*) These standards provide that aids to reduce the effect of impairment include wheelchairs, and Dr. Lawrence opines that "aids should also include an accessible toilet that is freely available to a disabled patient in the special circumstance of colonoscopy prep." (*Id.*) Defendants do not object to or refute Plaintiff's expert report. (*See* Doc. 186.)

On this record, various treating providers over the last year have recommended that Plaintiff get a colonoscopy, there is no medical opinion that Plaintiff does not require a colonoscopy, and Plaintiff's expert opines that the procedure is imperative to rule out colorectal cancer.

A hearing is necessary to fully flesh out the facts and address the parties' disputes over what reasonable and available accommodations exist for Plaintiff to complete bowel prep for a medically necessary colonoscopy. Plaintiff's Motion for a hearing on the Emergency Motion for Preliminary Injunction (Colonoscopy bowel prep accommodation) will therefore be granted.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is **withdrawn** as to Plaintiff's Emergency Motion for Preliminary Injunction – ADA Accommodations (Doc. 171), Emergency Motion for Preliminary Injunction (Colonoscopy bowel prep accommodation) (Doc. 182), and Motions for Hearings on the requests for injunctive relief (Docs. 179, 194).

(2) The Report and Recommendation (Doc. 101) is **adopted**. Plaintiff's objections (Doc. 108) are **overruled**.

(3) Defendant Thornell must answer the allegations in Count One and Count Three; Van Winkle, Naphcare, and Centurion must answer Count Two as to Plaintiff's disabled status and disability accommodations; and Defendants Thomas, Weigel, and Headstream must answer Count Two as to Plaintiff's disabled status and accommodations allegations. The remainder of Count Two and the entirety of Count Four are **dismissed**.

(4) Defendants Hope Ping, Jason Monson, Staci Ibarra, Joseph Anderson, Bobby Kirkham, the State of Arizona, and ADCRR are **dismissed**.

(5) Within 60 days of this Order, Plaintiff must substitute the names of the Doe FHA Defendants.

(6) Plaintiff must serve the Third Amended Complaint on Defendants Van Winkle, NaphCare, and Centurion within 30 days of this Order and file a return of service for each Defendant expeditiously after service. Defendants Van Winkle NaphCare and Centurion must answer the Third Amended Complaint or otherwise respond by appropriate motion within the time provided by the applicable provisions of Rule 12(a) of the Federal Rules of Civil Procedure.

(7) Defendants Thornell, Thomas, Weigel, and Headstream must answer or

otherwise respond to the Third Amended Complaint within 20 days of this Order.

(8) Plaintiff's Motion for Clarification and Motion to Expedite (Doc. 115, 118) are **granted** to the extent this Order addresses the requests and are otherwise denied.

(9) Plaintiff's Motion to Amend Scheduling Order (Doc. 202) is granted. An amended scheduling order will be issued by Magistrate Judge Boyle.

(10) Plaintiff's Motions for Hearings on the requests for injunctive relief (Docs. 179, 194) are **granted**.

(11) Rulings on Plaintiff's Emergency Motion for Preliminary Injunction – ADA Accommodations (Doc. 171) and Emergency Motion for Preliminary Injunction (Colonoscopy bowel prep accommodation) (Doc. 182) are **stayed**.

(12) An evidentiary hearing on Plaintiff's Emergency Motion for Preliminary Injunction – ADA Accommodations (Doc. 171) and Emergency Motion for Preliminary Injunction (Colonoscopy bowel prep accommodation) (Doc. 182) is scheduled for **September 3, 2025 at 1:30 p.m.**, before the Honorable Judge G. Murray Snow, United States District Court Judge, in Courtroom 602 of the Sandra Day O'Connor U.S. Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151. Counsel must appear in person.

(13) Petitioner shall appear by video teleconference. Petitioner's counsel shall contact the Court's System Technology Department by emailing vtc_helpdesk@azd.uscourts.gov or calling: (602) 322-7234 to make the necessary arrangements between ADOC and the Systems Technology Department. Petitioner's counsel shall notify the Court no later than **August 25, 2025**, the status of the vtc arrangements.

(14) No later than **August 29, 2025**, the parties must each file a Witness List identifying the witnesses to be called at the hearing.

Dated this 20th day of August, 2025.

G. Murray Snow
Senior United States District Judge

- 20 -